NOT DESIGNATED FOR PUBLICATION

No. 120,769

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CATHY MELONIE AIKINS,
*Appellant*,

v.

GATES CORPORATION,

and

INSURANCE COMPANY OF THE
STATE OF PENNSYLVANIA,
*Appellees*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed January 31, 2020. Affirmed.

*William L. Phalen*, of Pittsburg, for appellant.

*Brian J. Fowler* and *Brent A. Jepson*, of Evans & Dixon, LLC, of Kansas City, Missouri, for appellees.

Before BUSER, P.J., SCHROEDER and WARNER, JJ.

PER CURIAM: Cathy Melonie Aikins appeals the decision of the Workers Compensation Appeals Board reversing an award of permanent partial disability compensation. Aikins argues the record does not support the Board's finding that she failed to establish a permanent disability caused by the work-related car accident. We find the Board's decision is supported by substantial evidence in light of the full administrative record and thus affirm its ruling.

1

FACTUAL AND PROCEDURAL BACKGROUND

In December 2014, Aikins was injured in a car accident in a parking lot while leaving work at the Gates Corporation's rubber factory in Iola, Kansas. A fellow employee—who momentarily diverted his attention to pick up a pack of cigarettes—rear-ended Aikins in the queue to exit the parking lot. Aikins settled her personal-injury action against the other driver and sought payment for her injuries from her employer through the administrative workers-compensation process. The matter was submitted to an administrative law judge, and subsequently the Board, on a written record consisting of various deposition transcripts; neither the ALJ nor the Board heard live witness testimony.

The precise details of the accident, including the speed and degree of the impact, remained in dispute throughout the administrative proceedings. According to Aikins' deposition testimony, the other driver was moving at a slow speed—around 10 to 15 miles per hour—when he rear-ended her. Aikins later informed one of the medical experts she retained that the other car was traveling 25 to 30 miles per hour. Aikins testified that the impact flung her around like a ragdoll. During her first deposition, Aikins stated her head slammed into her headrest twice; she later testified that her head bounced off the headrest four times.

The other driver testified he was idling at no more than three to five miles per hour when he hit Aikins. He stated that he bumped into Aikins when he took his foot off the brake while fumbling for his cigarettes. He described the accident as "no worse of an impact than a bumper car," while Aikins framed the impact as far more forceful.

Aikins' airbag did not deploy, and neither her son (a passenger in her car) nor the other driver were injured. The police officer who responded to the accident reported that

neither vehicle was damaged. Aikins' car required $550 in repairs, and the other driver's insurer settled with Aikins for $15,501.20.

Immediately after the accident, Aikins' head hurt from the impact with the headrest and she had a headache. Although she told the other driver and the police officer she was fine and refused an ambulance, Aikins went to the emergency room several hours later because pain was spreading down her neck and back. Doctors performed a CT scan and X-ray before sending her home with muscle relaxers, pain pills, and instructions to put ice and heat on her neck and back.

When her condition did not improve, Aikins followed up with her doctor, who advised her to rest and prescribed physical therapy. Later, because she was still in pain, Aikins' doctor ordered MRIs of her neck and back, which showed a disc protrusion at C5/C6 and L5/S1. Aikins then began seeing a new doctor, who ordered more physical therapy and prescribed muscle relaxers and pain pills. Aikins testified the physical therapy helped, but she "still had a brick feeling in [her] lower back."

Around three months after the accident, Aikins' new doctor noted she was showing improvement and cleared her to return to work on certain restrictions. But Aikins continued to experience pain in her neck, back, and head; she also began having pain in her arms and legs. Gates accommodated Aikins' restrictions as she tried to return to work, but she was unable to perform her duties because of her pain and inability to stand for extended periods. Aikins testified she could only work for 5 to 10 minutes before she was in too much pain to carry on. Ultimately, Gates fired Aikins because of her inability to perform her job at the factory.

Aikins was sent to another doctor, who ordered conservative care and more physical therapy, but Aikins—who was still in considerable pain—wanted to consult with a spine specialist she had seen on TV. So her doctor referred her to a specialist in

3

Oklahoma City. This specialist recommended Aikins receive neck and back surgery for decompression on the left L5/S1 and bilateral foraminotomies at C5/C6. Aikins' original doctor did not believe she needed surgery.

Aikins went forward with the surgery. Afterward, Aikins still had severe pain in her head, neck, and back, but the pain in her arms and legs subsided. Aikins testified that she continues to take pain medicine and testified that she has problems with prolonged sitting and standing, can sometimes barely walk, and must lay down four or five times a day to alleviate her pain. Aikins was later diagnosed with transient ischemic attacks—essentially minute strokes—which cause daily tremors, shooting pains up her head, and short-term memory problems. Aikins testified that the transient ischemic attacks began after the car accident at Gates, but she did not produce any other evidence supporting a causal connection. Aikins has incurred $216,395.01 in medical bills—with a balance due of $123,393.55—from the injuries she alleges are attributable to the accident.

After she lost her job at Gates, Aikins sought work as a cook, but she was unable to physically perform the necessary tasks and was let go. Aikins stated she has been unable to find employment because she cannot lift more than 20 pounds and is unable to stand for extended periods of time. After the accident at Gates, Aikins was involved in two additional accidents, both of which involved her being rear-ended—one in 2015 and one in 2016. But Aikins claimed she was not injured in either of these accidents. She had also been in several car accidents before the incident in the Gates parking lot.

Three medical experts evaluated Aikins' injuries: Dr. Hopkins, Dr. Prostic, and Dr. Wheeler. While all three doctors personally examined Aikins and reviewed her medical records, none acted as a treating physician. Aikins' original medical files are not included in the record and were not provided to the ALJ or the Board.

4

According to Dr. Hopkins, an orthopedic surgeon, Aikins suffered a permanent cervical injury with radiculopathy and lumbar radiculopathy. Dr. Hopkins testified that Aikins has a 28% body as a whole impairment in her spine based on the 2014 American Medical Association Guide to the Evaluation of Permanent Impairment. Dr. Hopkins noted his opinion about Aikins' injuries would remain the same even if the car accident occurred at 5 to 10 miles per hour and stated he has treated similar injuries from such accidents. He also opined: "I think that even small impacts can cause injuries in this particular type of situation." But on cross-examination during his deposition, Dr. Hopkins conceded it would be less likely Aikins could have sustained such injuries if there were no damage to the vehicles involved in the accident.

Despite the two subsequent car accidents in 2015 and 2016, Dr. Hopkins stated that he believed the accident in the Gates parking lot caused Aikins' injuries. Dr. Hopkins specifically noted this opinion was based on "her medical history and her history of neurological incapabilities and symptoms and physical findings were only found after that injury in 2016 [*sic*]."

Dr. Hopkins noted that Aikins had protruding discs and osteophytes (arthritic changes that can cause stenosis) that preexisted the accident at Gates and admitted those ailments could have been responsible for some of her pain. But Dr. Hopkins did not believe any preexisting degenerative disease caused Aikins' injury: "I attribute that onset, I think with a reasonable degree of medical certainty, to the accident as they were not previously present by any information available to me."

Dr. Prostic also found Aikins sustained a permanent partial disability from the accident at Gates, which he concluded was 24% functional impairment. He further testified that the low-impact injuries Aikins sustained were "the prevailing factor in the injury, the need for medical treatment, the need for ongoing medical care, and medical restrictions." Dr. Prostic stated Aikins is capable of returning to light- to medium-level

5

employment with occasional lifting of 25 pounds, but should avoid frequent bending or twisting at the waist and forceful pushing or pulling. He noted that Aikins will require further physical therapy, anti-inflammatory and analgesic medicines for pain management, antidepressants, and possibly MRI studies to determine if more surgery is appropriate. That said, Dr. Prostic opined that he would not have surgically operated on Aikins had he been her treating physician.

When presented with evidence that the accident potentially occurred at a far lower speed than Aikins described, Dr. Prostic responded:

> "It is most unusual that an accident such as this would cause the severe injuries to an otherwise normal spine. . . . So what we have to say in this instance assuming that everything that has been told to me so far is true, that she had some preexisting disease in her spine that was exacerbated by the impact."

Dr. Prostic conceded that Aikins may have had a preexisting condition in her cervical and lumbar spine that the accident aggravated.

Dr. Wheeler—the medical expert retained by Gates—found that Aikins suffered no permanent injury from the Gates accident and further opined that Aikins required no future medical care. In Dr. Wheeler's opinion, Aikins' ailments were caused by preexisting degenerative changes, not trauma. Although she believed Aikins probably suffered cervical and lumbar strains or sprains in the accident, Dr. Wheeler concluded that Aikins' ongoing symptoms "were more likely related to her degenerative changes." Dr. Wheeler noted the medical records demonstrated Aikins' initial treating physician believed her injuries improved in the months after the accident and "the prevailing factor for [Aikins'] pursuit of surgery and completion of such surgery was her preexisting degenerative changes, not the work accident from December 5th of 2014."

Based on her physical examination of Aikins, Dr. Wheeler testified that she believed Aikins was over-reactive about the pain she was experiencing; Aikins' subjective feelings did not match the examination's findings. Dr. Wheeler noted that Aikins showed symptoms of pain, not symptoms of a strain or sprain at her examination. Because Dr. Wheeler believed Aikins' surgery and persistent complaints of pain were unrelated to the car accident at Gates, she found that Aikins suffered no permanent physical impairment—at least as it related to the car accident.

After reviewing the deposition testimony submitted, the ALJ noted the evidence gave him pause, describing it as "surrounded in a smoke of question, suspicion[,] and doubt." He found it was "unlikely" that "an accident, that on first appearance, appears so minor would result in injuries of this magnitude." But the ALJ nevertheless ruled in favor of Aikins. Though he expressed dissatisfaction with the lack of medical evidence from treating physicians and pointed out discrepancies in the expert medical opinions, the ALJ concluded that "all three doctors agree that *some* type of injury did take place from the auto accident." The ALJ found Aikins had a functional disability of 26% to her body as a whole—an average of Dr. Hopkins' and Dr. Prostic's findings—and concluded she "established and survived [her] burden of proof."

Gates appealed to the Board, which reversed the ALJ's decision. The Board found Aikins "sustained [a] personal injury by accident arising out of and in the course of her employment[,]" but failed to establish she had "sustained permanent functional impairment or a permanent injury caused by the collision." The Board noted 10 specific factors supporting its conclusion—the slow speed and low-impact nature of the accident, the lack of damage to the vehicles involved, Aikins' varying and improbable accounts of the accident, her inconsistent account of her medical history, Dr. Wheeler's opinions about Aikins' preexisting degenerative disease, and the concessions made by Dr. Hopkins and Dr. Prostic on cross-examination during their depositions.

7

Aikins appeals.

This court reviews actions of the Workers Compensation Appeals Board under the Kansas Judicial Review Act, K.S.A. 2018 Supp. 77-601 et seq. See K.S.A. 2018 Supp. 44-556(a). "At a hearing before the Board, a claimant has the burden of proving his or her right to compensation." *Moore v. Venture Corporation*, 51 Kan. App. 2d 132, 137, 343 P.3d 114 (2015). On appeal to this court, the party claiming error has the burden to prove error below. K.S.A. 2018 Supp. 77-621(a)(1); *Moore*, 51 Kan. App. 2d at 137.

In an appeal under the KJRA, we review the Board's factual findings to determine if the findings are supported by substantial evidence in light of the record as a whole. K.S.A. 2018 Supp. 77-621(c)(7). "This substantial-evidence standard evaluates the reasonableness of an agency's conclusion in terms of the evidence." *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, Syl. ¶ 1, 212 P.3d 239 (2009). "Substantial evidence is 'evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing [a] basis of fact from which the issue raised could be easily resolved.'" *Moore*, 51 Kan. App. 2d at 137. Put another way, substantial evidence is "such evidence as a reasonable person would accept as sufficient to support a conclusion." *Herrera-Gallegos*, 42 Kan. App. 2d 360, Syl. ¶ 1. In reviewing such a claim, this court does not reweigh the evidence or make an independent review of the facts. K.S.A. 2018 Supp. 77-621(d); *Moore*, 51 Kan. App. 2d at 137. Rather, we "must determine, after reviewing all the evidence, whether the evidence supporting the Board's decision has been so undermined by cross-examination or other evidence that it is insufficient to support its decision." 51 Kan. App. 2d at 138.

Because we consider the evidence "in light of the record as a whole," this court must consider *all* relevant evidence in the record—including any evidence that detracts

from the Board's finding. K.S.A. 2018 Supp. 77-621(d). We must also "'examine the presiding officer's credibility determination, if any'" and "'review the agency's explanation as to why the evidence supports its findings.'" *Moore*, 51 Kan. App. 2d at 137; see K.S.A. 2018 Supp. 77-621(d).

Aikins argues the Board's ruling—specifically its finding that she failed to establish a permanent disability caused by the accident—is not supported by the record. In particular, Aikins asserts the Board's reliance on Dr. Wheeler's opinions was misplaced and argues extensively regarding Dr. Wheeler's conclusions. Aikins urges this court to reinstate the ALJ's findings and conclusions. Gates claims Aikins' account of the record is skewed and contends that substantial evidence supports the Board's order.

The Board concluded that "the preponderance of the credible evidence" did not show Aikins had suffered a permanent injury or impairment caused by the rear-end collision in the Gates parking lot. The Board instead explained that "[a]lthough claimant sustained a compensable personal injury by accident in the nature of a temporary cervical and lumbar sprains or strains that improved, claimant's symptoms and any disability or impairment are the consequence of her preexisting degenerative disease, not the [accident]." Thus, the Board found the accident "caused no permanent disability."

The Board set forth 10 factual findings that led to its decision to reverse the ALJ:

> "1. [Aikins] agreed the other vehicle was moving slowly as it approached [Aikins'] car.
>
> "2. [Aikins] also testified the approaching car was moving 10-15 MPH.
>
> "3. By the time [Aikins] met with Dr. Hopkins, she said the speed of the colliding vehicle increased to 25-30 MPH.

9

"4. The preponderance of the evidence indicates the vehicle that struck [Aikins'] vehicle was traveling 5 MPH or less. There was no evidence any damage was sustained to either vehicle. There is no evidence that [Aikins'] passenger nor the other driver were injured.

"5. [Aikins'] testimony and the history she gave to the medical providers are inconsistent and lack credibility. The number and nature of the [accidents] she sustained contributes to the questionable nature of [Aikins'] testimony.

"6. The force [Aikins] described as she was violently bounced back and forth is improbable and unreasonable, given the speed and minimal nature of the collision. Dr. Wheeler questioned the accuracy of [Aikins'] testimony that she hit the headrest four times, especially given the lack of damage to either vehicle.

"7. Dr. Wheeler testified that giving [Aikins] the benefit of the doubt, the [accident] likely caused cervical and lumbar strains that improved. The doctor testified claimant's ongoing and recurring symptoms are likely due to the preexisting degenerative disease revealed by the MRI scans.

"8. Dr. Wheeler found no permanent injury due to the [accident].

"9. Dr. Prostic testified that a low impact injury was less likely to cause [Aikins'] abnormalities unless the accident aggravated prior conditions. The doctor testified [Aikins] more likely than not had pre-existing disease in the cervical and lumbar spine which may not have become symptomatic but for the accident which aggravated those symptoms.

"10. Dr. Hopkins testified that [Aikins'] injuries would be less likely if there was no injury to either vehicle."

Our examination of the administrative record confirms that these findings are supported by substantial evidence in light of the record as a whole.

First, the record reflects that although there was conflicting testimony as to the speed of the vehicle that struck Aikins' car, the driver of that vehicle consistently

described his speed as three to five miles per hour. Aikins' account changed over time, ranging from 10 to 15 miles per hour shortly after the accident to 30 miles per hour when she was talking with a physician months later. And the police report noted that no one was injured and neither car was damaged. Aikins' car only needed minor repairs totaling $550, and the other driver's insurance carrier settled her claim for $15,501.20. While the evidence is contested, the Board's conclusion that the accident occurred at a low speed is reasonable and supported by the record.

Similarly, substantial evidence in the record supports the Board's finding that Aikins' testimony and the history she provided to the medical experts was inconsistent and improbable, undermining her credibility. The Board further noted that the number of accidents she had been involved in, both before and after the accident at Gates, contributed to the questionable nature of her claims.

Under K.S.A. 2018 Supp. 77-621(d), this court is required to consider any credibility or veracity determination made "by the presiding officer who personally observed the demeanor of the witness." See *Moore*, 51 Kan. App. 2d at 142. But neither the Board nor the ALJ personally witnessed Aikins' testimony, or any other testimony in this matter. And while the Board and the ALJ reached opposite conclusions, both questioned Aikins' credibility. The police report, the other driver's testimony, the minimal damage to the vehicles, and Aikins' inconsistent testimony about the impact all buttress the Board's rejection of Aikins' narrative of the accident.

The Board observed that Aikins' credibility was undermined by her inconsistent recitation of her medical history to medical experts—or at least to Dr. Hopkins. The record demonstrates that Aikins told Dr. Hopkins the car that hit her was traveling 25 to 30 miles per hour, which appears to have affected his analysis and conclusion. When confronted with the possibility the car was traveling only five miles per hour and that there was no damage to either vehicle, Dr. Hopkins acknowledged these facts made the

11

accident less likely to have caused Aikins' injuries. Aikins also told Dr. Hopkins that she had never had trouble with her back prior to the accident, but he later learned she had received treatment for an acute cervical sprain following a car accident in 2010. It is unclear whether this omission impacted Dr. Hopkins' analysis.

The reports and opinions of the three medical experts were critical to the Board's analysis and its ultimate conclusion. But none of the experts acted as Aikins' treating physician; each expert evaluated her only one time and had only the medical and factual background provided by the parties. Aikins' actual medical files are not included in the record, except to the extent particular records were attached as exhibits to the depositions.

Aikins argues the Board gave undue weight to the opinions of Dr. Wheeler, which she describes as the outlier of the three expert opinions. Dr. Wheeler stated Aikins suffered a sprain or strain in the accident. But she concluded Aikins' injury improved over time, and her preexisting degenerative disease caused her lingering ailments, not the accident. There is considerable evidence in the record, including the testimony of Dr. Prostic and Dr. Hopkins on cross-examination, supporting this position. To the extent Dr. Prostic's and Dr. Hopkins' opinions contradicted those of Dr. Wheeler, they were rendered significantly less persuasive due to their concessions about the nature of the accident and Aikins' preexisting degenerative disease.

Aikins claims Dr. Wheeler's reliance on a note in her medical file suggesting her improvement in the months after the accident undermined her expert opinion and rendered it unreliable. But both Dr. Wheeler and Dr. Hopkins commented on the note as well. The note stated: "Patient returns for followup for her treatment of her cervical lumbar sprain. The patient again is functioning satisfactorily. The therapy has helped her significantly. The patient is ready to return to work." Despite this conclusion by her treating therapist, Aikins did not return to work because of her pain and soon after pursued surgery to remedy the problem. But the fact that Aikins did not return to work

because of her pain does not negate her therapist's conclusion that the injuries caused by the accident were improving in the months following the accident and did not require surgical intervention. Nor does it undermine Dr. Wheeler's opinion that Aikins suffered a strain or sprain in the accident that was not permanent and ultimately resolved.

Aikins' treating therapist prior to surgery, Dr. Wheeler, and Dr. Prostic all expressed doubts about the necessity of Aikins' surgeries. Dr. Wheeler concluded that "the prevailing factor for [Aikins'] pursuit of surgery and completion of such surgery was her preexisting degenerative changes, not the work incident from December 5th of 2014." Dr. Wheeler pointed out that MRIs taken around that time further suggested degenerative changes. Dr. Prostic was unaware of Aikins' preexisting degenerative disc disease prior to his deposition, and he noted an aggravation of that disease was a potential explanation for Aikins' pain and impairment.

While Dr. Prostic and Dr. Hopkins both concluded that Aikins had a permanent functional impairment, their opinions were seriously undermined by cross-examination during their respective depositions. And although both doctors stood by their opinions, they did not provide any substantive explanation as to how they remained able to conclude the accident was the prevailing cause of Aikins' impairment in light of her preexisting degenerative changes and the low-impact nature of the accident.

"An injury is not compensable" under the Kansas Workers Compensation Act "solely because it aggravates, accelerates or exacerbates a preexisting condition or renders a preexisting condition symptomatic." K.S.A. 2018 Supp. 44-508(f)(2). The Board gave significant weight to Dr. Wheeler's and Dr. Prostic's opinions regarding Aikins' preexisting degenerative disease. Dr. Prostic acknowledged, given the low speed of the accident and nature of the impact, that "assuming that everything that has been told to me so far is true, [Aikins] had some preexisting disease in her spine that was exacerbated by the impact." Dr. Wheeler was more explicit, stating Aikins did not suffer

13

any permanent impairment from the car accident and her ongoing symptoms "were more likely related to her degenerative changes." Dr. Hopkins also agreed that Aikins' medical records showed preexisting degenerative changes and that such arthritic changes can lead to stenosis in the cervical spine and cause pain such as Aikins experienced (though he nevertheless believed her current injuries were caused by the accident).

This court shall grant relief "only if it determines . . . the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole." K.S.A. 2018 Supp. 77-621(c)(7). Given that all three medical experts agreed that the presence of degenerative changes was a likely cause of Aikins' symptoms and each noted the low-impact nature of the accident was unlikely to produce such injuries and disabilities in the absence of such a preexisting condition, substantial evidence in the record supports the Board's factual findings and its ultimate conclusion that Aikins failed to show she sustained permanent functional impairment or permanent injury in the parking lot accident.

Affirmed.